IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LUIS HERNANDEZ GARCIA,       :       Civil No.  1:22-CV-2039
                             :
         Plaintiff,          :
                             :
    v.                       :
                             :       (Magistrate Judge Bloom)
COMMISSIONER OF SOCIAL       :
SECURITY,                    :
                             :
         Defendant.          :

MEMORANDUM OPINION

I.  Introduction

On March 29, 2019, Luis Hernandez Garcia filed an application for disability and disability insurance benefits, as well as supplemental security income.  A hearing was held before an Administrative Law Judge ("ALJ"), who found that Garcia was not disabled from his alleged onset date, September 4, 2018, to the date of the ALJ's decision, June 29, 2021.

Garcia now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.  After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019),

we conclude that substantial evidence supports the ALJ's decision in this case.  Therefore, we will affirm the decision of the Commissioner denying Garcia's claim.

## II.  Statement of Facts and of the Case

On March 29, 2019, Luis Hernandez Garcia applied for disability and disability insurance benefits, alleging disability due to back pain, knee arthritis, depression, anxiety, high cholesterol, and high blood pressure.  (Tr. 606).  He alleged an onset date of disability of September 4, 2018.  (*Id.*).  Garcia was 47 years old at the time of his alleged onset of disability, had a general equivalency degree, and had past relevant work as a cleaner, a truck operator, and a laborer.  (Tr. 32).

Garcia's medical records indicate that he began seeking treatment for back pain after he was involved in a forklift collision on September 4, 2018, the alleged onset date.  (Tr. 817).  On September 12, 2018, Garcia treated with Dr. Robert Bagian, M.D., complaining of dull, diffuse pain throughout his back.  (Tr. 1006).  During the visit, Garcia walked with a normal gait, turned his head without difficulty, had full strength in his lower extremities and his back muscles, and exhibited normal sensitivity

2

to light touch.  (Tr. 1008).  Dr. Bagian opined that Garcia could return to work immediately, but could not operate or work on industrial machinery, lift more than five pounds, climb stairs or ladders, bend, twist, or change positions frequently.  (Tr. 1009).

On January 7, 2019, Garcia received an independent medical evaluation from Dr. Michael S. Rosenthal, D.O.  (Tr. 817).  On examination, Garcia exhibited spasms and tenderness in the left lumbar paravertebral muscles, tenderness over the left sacroiliac joint, and a limited range of motion in his spine.  (Tr. 819).  However, Garcia also displayed full strength in his upper and lower extremities, had a normal gait, performed tiptoe, heel, and tandem walking, displayed normal reflexes, and performed seated and supine straight leg raises without pain.  (*Id.*).  Based on these findings, Dr. Rosenthal opined that Garcia could not lift, carry, push, or pull more than 10 pounds and could only occasionally twist or bend at the waist.  (Tr. 820).

The following day, Garcia was evaluated by a second independent medical examiner, Dr. John Kline, M.D.  (Tr. 677).  During the examination, Garcia exhibited a normal gait, full range of motion in the

3

lumbosacral spine, hips, knees, and ankles, full strength in his upper and lower body, normal reflexes, and appropriate sensitivity to light touch. (Tr. 680-81). His spine was nontender on palpation and he did not exhibit palpable muscle spasms or reproducible trigger points in his back. (Tr. 681). Though Garcia had positive Waddell's findings, Dr. Kline noted that he "demonstrated a high degree of symptom exaggeration or inappropriate pain behavior" during testing. (Tr. 682). Based on those findings, Dr. Kline opined that Garcia could immediately return to work with no limitations. (Tr. 684).

Between October 19, 2018 and February 13, 2019, Garcia attended four appointments with Dr. Avidon Appel, D.O. (Tr. 971, 981). During those sessions, Garcia experienced muscle spasms and pain in his back, numbness and tingling in his left thigh, and a limited range of motion in his spine. (Tr. 972-73, 981). However, Garcia's reflexes and sensation were intact, his lungs were clear to auscultation, and his back pain and flexibility improved throughout his sessions. (Tr. 971-72, 981). At the end of the last session, Dr. Appel stated that Garcia could return to light sedentary work but would require frequent breaks to stand and stretch

4

and could not lift or carry more than five pounds, sit, or stand for more than 15 minutes at a time, or walk more than ten minutes at a time. (Tr. 983).

In April of 2019, Garcia began therapy for anxiety and depression. (Tr. 920). Though he was discharged after two months for nonattendance, he resumed therapy in July of 2019. (Tr. 921, 1052). During this therapy sessions, Garcia consistently denied suicidal ideation and was alert, oriented, and goal directed. (Tr. 1045, 1047, 1050, 1052). Garcia's treatment notes also indicate that he was calm and cooperative, that his cognition, memory, and judgment were fair to good, that his gait was within normal limits, and that he did not appear to be experiencing delusions or paranoia during his visits. (Tr. 1047-51). On several occasions, Garcia reported that he was consistently taking his medication, which was ameliorating his paranoia, improving his sleep, and decreasing the frequency of his nightmares. (Tr. 1045, 1047, 1050, 1052).

Between August 14, 2019 and October 18, 2019, Garcia sought treatment at UPMC for headaches and fatigue. (Tr. 936-50). After

reporting excessive snoring, Garcia was diagnosed with obstructive sleep apnea.  (Tr. 942, 948-49).   Garcia's treatment notes show that he consistently exhibited a normal gait and had full strength in his upper and lower extremities, intact sensation to light touch, and normal reflexes. (Tr. 939-40, 945, 949).

On October 24, 2019, Garcia was evaluated by two consultative examiners—Dr. Ahmed Kneifati, M.D., and Dr. Kathleen Ledermann, Psy.D. (Tr. 871-89).  During his examination with Dr. Kneifati, Garcia experienced tenderness in his spine and knees but exhibited a normal gait, could walk on his heels and toes without difficulty, and had stable joints.  (Tr. 887).  Dr. Kneifati found that Garcia had no manipulative limitations, could continuously lift and carry up to 10 pounds, and could occasionally lift and carry up to 20 pounds.  (Tr. 892, 894).  He also opined that Garcia could stand for up to three hours and walk for up to two hours in an 8-hour workday and could continuously stand for two hours and walk for one hour.  (Tr. 893).  Finally, Dr. Kneifati stated that Garcia required a quiet work environment and could only tolerate occasional

exposure to unprotected heights, moving mechanical parts, humidity, wetness, extreme cold, and extreme heat. (Tr. 896).

During his examination with Dr. Ledermann, Garcia was cooperative, exhibited adequate social skills, displayed normal grooming and hygiene, had normal thought processes and speech, and was alert and oriented to person, place, and time. (Tr. 872-73). During memory and attention tests, Garcia could recall three out of three objects immediately and one of three objects after a delay, perform serial sevens, do simple counting, and perform simple calculations. (*Id.*). Based on these findings, Dr. Ledermann opined that Garcia had, at most, moderate limitations in interacting with others, mild limitations in understanding, remembering, and carrying out complex instructions, and no limitations in understanding, remembering, and carrying out simple instructions. (Tr. 876-77).

In May of 2020, Garcia began physical therapy for his back pain. (Tr. 1137, 1168). However, on August 10, 2020, Garcia was discharged from physical therapy for failing to attend further sessions. (Tr. 1138).

Garcia's discharge note indicated that his "progress towards goals is poor and his tolerance to treatment is poor." (*Id.*).

In January of 2021, Garcia was scheduled for surgery to remove hardware from his right foot. (Tr. 1513). In the weeks leading up to his surgery, Garcia reported on two occasions that he was not experiencing fatigue and that he could dress, bathe, and feed himself, walk up to two blocks on level ground, and climb a flight of stairs or a hill. (Tr. 1510-14). He also reported that he could perform heavy work, like scrubbing floors, lifting, or moving furniture, and could play strenuous sports, such as swimming, skiing, and singles tennis. (Tr. 1513).

On March 9, 2021, Garcia visited UPMC, complaining of fatigue, nonrestorative sleep, a generalized body ache that had been persisting for more than 10 years, and pain in his hands, shoulders, back, hips, knees, and feet. (Tr. 1569). On examination, Garcia exhibited tenderness in his trapezius, arms, forearms, and thighs, and had Heberden's nodes on both hands. (Tr. 1574). However, Garcia exhibited a full range of motion and had no joint fullness or tenderness in his wrists, shoulders, ankles, or feet. (*Id.*). Garcia's treatment notes state that he "has chronic

pain, fatigue, schizophrenia, anxiety, and depression" and that it "seems that patient has chronic fatigue syndrome...." (Tr. 1575). However, approximately one week later, on March 22, 2021, Garcia again denied experiencing excessive fatigue. (Tr. 1549).

Against the backdrop of this evidence, the ALJ conducted a hearing regarding Garcia's disability application on May 11, 2021. (Tr. 46-77). Garcia and a vocational expert both testified at the hearing. (*Id.*). Following the hearing, on June 29, 2021, the ALJ issued a decision denying Garcia's application for benefits. (Tr. 12-34). First, the ALJ concluded that Garcia engaged in substantial gainful activity during the fourth quarter of 2019, but otherwise did not engage in substantial gainful activity between September 4, 2018, his alleged onset date, and June 29, 2021, the date the decision was issued. (Tr. 24-25). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Garcia suffered from the following severe impairments: degenerative disc disease, osteoarthritis in both knees and multiple other joints, obesity, major depressive disorder, delusional disorders, and an anxiety disorder. (Tr. 25). The ALJ also found that Garcia had been

9

treated for hypertension and high cholesterol. (*Id.*). However, the ALJ concluded that those conditions were non-severe because none of them caused more than a minimal limitation in Garcia's ability to perform basic work-related activities. (*Id.*). At Step 3, the ALJ concluded that none of Garcia's severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 25-29).

Between Steps 3 and 4, the ALJ concluded that Garcia had the residual functional capacity to:

> [P]erform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can frequently climb ramps or stairs but only occasionally climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, or crawl. The claimant can perform simple, routine, repetitive tasks involving one or two step tasks requiring little to no demonstration that can be learned within 30 days or less from the beginning of the job. He can make judgements on simple work-related decisions. The claimant can occasionally interact with the public, coworkers, and supervisors in a routine work setting.

(Tr. 29).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, Garcia's reported symptoms, and the medical opinion evidence. (Tr. 29-35). Ultimately, the ALJ found

that Garcia's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the objective medical evidence. (Tr. 30). Garcia testified that he suffers from pain in both knees, his lower back, and his right foot. (Tr. 54, 59). According to Garcia, he has trouble walking up steps, can only sit, stand, or drive for 30 minutes at a time, and cannot lift more than ten pounds. (Tr. 58, 64-65). However, Garcia testified that he could walk on a flat surface for 30-40 minutes without stopping, shower by himself, make sandwiches, and brew coffee. (Tr. 65-66). He also testified that he could perform simple household chores, such as vacuuming, washing clothes, cleaning his table, and washing pans, and that his sons assist him with more strenuous chores. (Tr. 66).

Garcia also testified that he suffers from migraines, sleep apnea, depression, and schizophrenia, which causes auditory hallucinations and paranoia. (Tr. 60-63, 69). According to Garcia, his paranoia is so severe that, when he is home alone, he believes people are coming to murder him. (Tr. 63). He testified that his migraines are intense, but that medication has reduced their frequency from four to five times per month

to once or twice per month.  (Tr. 61-62).  Finally, Garcia testified that although he uses a device to ameliorate his sleep apnea, he only sleeps for five to six hours per night and sometimes has trouble sleeping due to nightmares.  (Tr. 69).

The ALJ found Garcia's testimony to be inconsistent with the objective clinical findings.  (Tr. 26).  He did not find Garcia wholly credible, as Dr. Klein noted that Garcia exaggerated his symptoms and overreacted to pain during his examination.  (Tr. 32).  The ALJ reasoned that although Garcia testified to debilitating mental health symptoms, he told his mental health providers that his symptoms were well-controlled and manageable on psychotropic medications.  (*Id.*).  The ALJ also noted that Garcia's activities of daily living were inconsistent with his alleged mental impairments, as Garcia testified that he could manage his own personal care, complete household chores, drive a car, shop for groceries, and prepare simple meals.  (*Id.*).  Regarding Garcia's alleged physical impairments, the ALJ noted that Garcia told his medical providers that he could walk one to two blocks on level ground, climb a flight of stairs or climb a hill, perform heavy work, such as scrubbing

floors, lifting, or moving furniture, and participate in strenuous sports, like swimming, skiing, and singles tennis. (*Id.*). Finally, the ALJ noted that Garcia was discharged from mental health counseling and physical therapy for failing to attend sessions. (*Id.*).

Next, the ALJ considered the opinions of two state agency consultants—Dr. Josie Henderson, M.D., and Dr. Michael Brown, D.O. (Tr. 33). Dr. Henderson opined that Garcia could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and occasionally climb ladders, ropes, and scaffolds. (Tr. 87-88). She also found that Garcia had no visual, manipulative, or communicative limitations but could not tolerate concentrated exposure to extreme cold, wetness, humidity, and hazards. (Tr. 88). Dr. Brown's opinion was identical to Dr. Henderson's, except that Dr. Brown did not assess any environmental limitations. (Tr. 125-141). The ALJ found both opinions persuasive because both physicians supported their conclusions by referencing Garcia's normal examination findings, such as his normal gait, intact sensations and reflexes, full strength, and normal motor functions. (Tr. 33). However, the ALJ found Dr. Brown's opinion slightly more

13

persuasive, as he did not find support for the environmental limitations in Dr. Henderson's opinion. (*Id.*).

The ALJ also considered Dr. Kneifati's opinion, which he found partially persuasive. (Tr. 33). The ALJ determined that Dr. Kneifati adequately supported his opinion that Garcia could lift and carry at the light level and required postural limitations. (*Id.*). However, the ALJ found that Dr. Kneifati's limitations regarding Garcia's standing and walking abilities were not supported, as his own examination showed that Garcia had a normal gait, could walk on his toes and heels without difficulty, and had stable joints. (*Id.*).

The ALJ also considered Dr. Appel's opinion, which he found unpersuasive. (Tr. 33-34). He reasoned that Dr. Appel's limitations on sitting, standing, walking, and lifting were inconsistent with his examination findings, which showed that Garcia had normal reflexes, motor function, and sensitivity to light touch. (Tr. 34). He also reasoned that Garcia's activities of daily living did not support significant limitations, as Garcia could prepare meals, complete household chores, manage personal care, and drive a car. (*Id.*).

Next, the ALJ considered Dr. Kline's opinion that Garcia could return to work with no limitations and found it entirely unpersuasive. (Tr. 34). The ALJ reasoned that although Dr. Kline's examination produced normal findings, the totality of the medical evidence supported greater restrictions. (*Id.*). In reaching that determination, the ALJ noted that Garcia experienced side effects from his medication, such as fatigue, had a limited range of motion in his spine, experienced paraspinal tenderness, and suffered from pain and tenderness in multiple joints from osteoarthritis. (*Id.*).

The ALJ also found Dr. Bagian's opinion unpersuasive. (Tr. 34). The ALJ reasoned that Dr. Bagian's assessed limitations on lifting, bending, twisting, climbing, and operating machinery were inconsistent with his own examination findings, which showed that Garcia could walk on his heels and toes and had a normal gait, full strength in his extremities and back muscles, and intact sensation to light touch. (*Id.*). The ALJ also found that Dr. Bagian's opinion was inconsistent with Garcia's statements that he could climb a flight of stairs or climb a hill, perform heavy work, such as scrubbing floors, lifting or moving furniture,

15

and participate in strenuous sports, like swimming, skiing, and singles tennis. (*Id.*).

Similarly, the ALJ found Dr. Rosenthal's opinion unpersuasive on the grounds that it contradicted the findings in his own examination and other medical evidence in the record. (Tr. 34). Though Dr. Rosenthal limited Garcia to sedentary work, the ALJ noted that during the examination, Garcia walked with a normal gait and had a full range of motion in his joints, full strength, and normal reflexes. (*Id.*). The ALJ also noted that other examinations in the record showed similar unremarkable results. (*Id.*).

By contrast, the ALJ found the opinions of two state agency psychological consultants—Dr. Thomas Fink, Psy.D., and Dr. John Gavazzi, Psy.D.—generally persuasive. (Tr. 35). Dr. Fink opined that Garcia could follow simple instructions, communicate with others, and perform simple tasks within his physical limitations. (Tr. 90). Similarly, Dr. Gavazzi opined that Garcia was not limited in his ability to remember, understand, concentrate, or maintain pace. (Tr. 121). Though Dr. Gavazzi found that Garcia struggled with social skills due to

paranoia, he opined that Garcia could maintain socially appropriate behavior and could perform simple, routine, repetitive tasks in a stable environment. (*Id.*).

The ALJ found that both opinions were supported by the findings regarding Garcia's normal mental status examinations, which showed that he was alert and oriented, that his memory and cognition were intact, that his thought processes were goal-directed, and that he displayed fair to good insight and judgment. (Tr. 35). However, the ALJ found that Drs. Fink and Gavazzi did not adequately account for Garcia's paranoia and auditory hallucinations. (*Id.*). In light of those conditions, the ALJ found that Garcia could only occasionally interact with the public, coworkers, and supervisors in a routine work setting. (*Id.*).

Finally, the ALJ considered Dr. Ledermann's opinion, which he found partially persuasive. (Tr. 35). He found that Dr. Ledermann adequately supported her opinion regarding Garcia's social functioning. (*Id.*). However, the ALJ found that Dr. Ledermann overestimated some areas of Garcia's cognitive functioning and underestimated others. (*Id.*). Specifically, the ALJ found that Garcia was more limited in his ability to

adapt and manage himself, concentrate, persist, and maintain pace in light of his suicidal ideations, paranoia, and poor attention. (*Id.*). The ALJ also found that Garcia was less limited in his ability to understand, remember, and apply information, as his memory was intact, he displayed fair to good judgment and insight, and he was able to think logically. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Garcia could not perform his past work but found at Step 5 that he could perform other jobs in the national economy, such as a cleaner, bakery worker, and produce weigher. (Tr. 36-37). Accordingly, the ALJ found that Garcia had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 37).

This appeal followed. On appeal, Garcia challenges the ALJ's decision on the grounds that he failed to consider Garcia's chronic fatigue syndrome, incorrectly evaluated the opinions of Drs. Kneifati, Appel, Bagian, and Rosenthal, and ignored evidence of manipulative limitations. As discussed in greater detail below, having considered the

arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be affirmed.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of This Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v.*

*Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).  However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled

20

is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v.*

21

*Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.  *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).  Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a).  This requires a claimant to show a severe physical or mental impairment that precludes her from engaging in previous work or "any other substantial gainful work which

exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20

C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work.  *Mason*, 994 F.2d at 1064.  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.  While some courts emphasize the necessity of

medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a

disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.  *See Titterington,* 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application on March 29, 2019, after Social Security Regulations regarding the consideration of medical opinion evidence were amended.  Before March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard.  However, in March of 2017, the regulations governing the treatment of medical opinions were amended.  Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency,

relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over

others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066.  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated.  *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

D. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only [ ] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Garcia first argues that the ALJ erred by failing to consider his chronic fatigue syndrome ("CFS") in accordance with Social Security Regulation ("SSR") 14-1p.  (Doc. 12 at 9-10).  However, as the Commissioner argues, it does not appear that Garcia was formally

diagnosed with CFS. (Doc. 14 at 16). Garcia only points us to one medical record that mentions CFS, (Doc. 12 at 9-10), which states that it "*seems that patient has chronic fatigue syndrome….*" (Tr. 1575) (emphasis added). In our view, this one speculative note within over 1,000 pages of medical records does not constitute a diagnosis. *See Ratcliffe v. Heckler*, 788 F.2d 1389, 1391 (8th Cir. 1986) (reasoning that a finding of "*possible organic brain syndrome*" was too speculative to constitute a definitive diagnosis) (emphasis in original).

Even if Garcia had been formally diagnosed with CFS, we believe the ALJ's failure to consider that impairment would be harmless. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights;'" that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014). It is well-settled that "the burden of showing that an error is harmful normally falls upon the party attacking the

agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

In our view, Garcia has not shown that the outcome of the proceeding would likely have been different if the ALJ had considered CFS as a medically determinable impairment. A claimant is not disabled unless he has a "medically determinable impairment that could reasonably be expected to produce [his] symptoms…" 20 C.F.R. § 404.1529. It is the claimant's burden to put forth evidence showing "how his impairments, whether individually or in combination, amount to a qualifying disability." *Romero v. Comm'r of Soc. Sec.*, 2020 WL 2301444, at *1 (D.N.J. May 8, 2020) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). However, Garcia does not contend, either in his social security application or his hearing testimony, that he is disabled due to extreme fatigue. (Tr.45-77, 606).[1] In fact, Garcia told medical providers

---

[1] Though Garcia testified that he slept for five to six hours per night, he did not testify that he suffered from extreme fatigue. (Tr. 69). Moreover, Garcia testified that he had trouble sleeping because he had sleep apnea and experienced nightmares, not because he had CFS. (*Id.*). We note that Garcia's testimony is inconsistent with a diagnosis of CFS, which SSR 14-1p defines as an impairment that causes prolonged fatigue which

on multiple occasions that he was not excessively tired. (Tr. 1510-14, 1549). Because Garcia does not claim to be disabled due to fatigue, we believe that any failure by the ALJ to consider CFS as a medically determinable impairment is, at most, harmless error.

Garcia also argues that the ALJ erred in finding Dr. Appel's opinion unpersuasive. (Doc. 12 at 11-12). As detailed above, the ALJ reasoned that Dr. Appel's extremely restrictive opinion was inconsistent with his own examination findings and Garcia's activities of daily living. (Tr. 33-34). Garcia contends that, as a layperson, the ALJ is unqualified to determine whether the results of Dr. Appel's physical examination contradict his opinion. (Doc. 12 at 11). However, an ALJ may consider contradictions between an expert's opinion and his examination notes when fashioning an RFC determination. *Cordero v. Kijakazi*, 597 F. Supp. 3d 776, 806 (E.D. Pa. 2022) (citing *Smith v. Astrue*, 359 F. App'x 313, 316–17 (3d Cir. 2009) (nonprecedential)). Garcia also contends that the ALJ mischaracterized his activities of daily living by stating that he

---

"[c]annot be explained by another physical or mental disorder." SSR 14-1p(I)(A)(2).

could perform household chores.  (Doc. 12 at 11).  We disagree.  Though Garcia testified that his sons help him perform some chores, he also testified that he could perform simple household chores independently. (Tr. 65-66).  Therefore, in our view, Garcia has not identified any error in the ALJ's treatment of Dr. Appel's opinion.

Next, Garcia argues that the ALJ erred by finding the opinions of Drs. Bagian, Rosenthal, and Kneifati unpersuasive.  (Doc. 12 at 10-15). Though Garcia makes multiple arguments regarding those opinions, they all turn on the same premise—that some evidence in the record supports the limitations set forth by each expert.[2] (*Id.*).  However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo*, 383 U.S. at 620.  Thus, the only relevant question is

---

[2] Garcia argues that the ALJ "cherry pick[ed]" normal examination findings and ignored abnormal ones.  (Doc. 12 at 13).  However, we note that the ALJ assessed even greater limitations than Drs. Kline, Fink, Gavazzi, and Lederman.  (Tr. 34-35).  In assessing those limitations, the ALJ pointed to various abnormal findings, such as Garcia's joint pain, limited range of spinal motion, paraspinal tenderness, suicidal ideations, paranoia, auditory hallucinations, and poor attention.  (*Id.*). Therefore, as a general matter, we do not believe that the ALJ ignored evidence that was favorable to Garcia when fashioning the RFC.

whether the ALJ adequately articulated why he assessed fewer limitations than Drs. Bagian, Rosenthal, and Kneifati. *See Durden*, 191 F. Supp. 3d at 455 (explaining that the ALJ may formulate a claimant's RFC based on different parts of different medical opinions, so long as he or she adequately articulates his rationale). In our view, the ALJ provided an adequate explanation for his assessment of the medical opinion evidence.

As explained above, the ALJ determined that some of the limitations set forth by Drs. Bagian, Rosenthal, and Kneifati were too extensive considering the objective medical evidence. (Tr. 33-34). He noted that that Garcia told his medical providers he could perform heavy work and play strenuous sports, that the physical examinations performed by all three physicians were unremarkable, and that other physical examinations throughout the medical record showed that Garcia had a normal gait, full strength, intact sensations, normal reflexes, and normal coordination. (*Id.*). Because the ALJ explained why he rejected each limitation and supported his reasoning by citing to the objective medical record, the ALJ met his burden of articulation.

Finally, Garcia argues that the ALJ should have included greater manipulative limitations in the RFC. (Doc. 12 at 15). He contends that the ALJ ignored evidence that he exhibited tenderness in his trapezius, arm, and forearm muscles and had Heberden's nodes, joint tenderness, and osteoarthritis in both hands. (*Id.*). However, all three physicians who expressly considered manipulative limitations found that Garcia had none.[3] (Tr. 88, 119, 894). We cannot say that the ALJ erred by adopting the unanimous opinion of those experts. *See Kenyon v. Kijakazi*, No. 1:22-CV-1457, 2023 WL 5617791, at *12 (M.D. Pa. Aug. 30, 2023) (remanding a case where the ALJ rejected every medical opinion in the record).

Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

---

[3] Though Drs. Appel and Kline did not evaluate whether Garcia had any manipulative limitations, Dr. Appel's report shows that Garcia exhibited a full range of motion in both wrists and Dr. Kline opined that Garcia could return to work without any restrictions whatsoever. (Tr. 684, 973).

## IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 16th day of February 2024.

*s/ Daryl F. Bloom*
Daryl F. Bloom
United States Magistrate Judge
